Case number 13-59-60, Richard Wesley v. Joanne Rigney, individually and in her capacity as a police officer for the City of Covington. Arguments not to exceed 15 minutes per side. Bill for the appellant. Counsel, you may proceed for the appellant. Thank you, Judge. Good morning. Good morning. My name is Paul Hill. I'm the attorney for Richard Wesley. At this time, we'd request three minutes of rebuttal, Judge. All right. Your Honor, I am here today to ask this Court to overturn two rulings of the District Court. The first of which was the dismissal of Mr. Wesley's false arrest claim. And that was pursuant to Rule 12b-6 motion. The second of which flowed from that decision. And that was a retaliatory arrest, his retaliatory arrest claim, which was dismissed a few months later in regard to summary judgment. I'd like to address the false arrest claim first, Judge. All right. First of all, Judge, procedurally, the Rule 12b-6 motion was unusual in that it was filed more than two years after we filed the original complaint. So it was filed, and during those two, a little bit more than two years, we had completed discovery. We had obtained all of the relevant documents at some difficulty, I might add, including the CAC tape, which is at the heart of the case, and also the cabinet records for J.S., the 7-year-old, and his family. We had taken numerous depositions. We each retained experts. And then Detective Rigney filed our motion to dismiss after all that occurred. You were following an amended complaint? We did follow an amended complaint, but that just added the retaliation count, Judge. We didn't go back and change the initial complaint, but she did that in relation. That's the purpose. That's why she did it, because that's why she's permitted to do it. But it was an unusual exercise, because we had to go back in time some two years before and look at what we pled and ignore all of the important evidence that we learned throughout those two years. And in doing so, if we do that, if we go back to the complaint and look at whether or not it was properly pled, there's no doubt that that case was properly pled. If you look at the requirements for Rule 8, Rule 8 requires a short and plain statement showing the pleader is entitled to relief. And a complaint is not to be dismissed if its factual allegations rise above a speculative level. And also, because this was a civil rights complaint, there's even a higher standard that the court must consider before dismissing the case. The Zwickler case, Zwickler v. Kudas, says, In actions under the Civil Rights Act, the power of federal court to abstain from hearing and deciding the merits of claims properly brought before it is a closely restricted one which may be evoked only in a narrowly limited set of special circumstances. It requires, if there is a dismissal, it requires this court to scrutinize such a dismissal with special care. Your Honors, after four years of living this case, I think I understand why there was such a high standard to dismiss a civil rights case. First of all, the issue is so important. I mean, we're talking about a person's freedom, the right to be free. And for Mr. Wesley, Mr. Wesley is one of our good people, Your Honor. He put himself through school and he was arrested. He did all that so he could be a counselor to teach kids. His arrest ended all of that. So it's certainly a significant issue there. But also, and most importantly, in a civil rights case, the police, the social workers, they have all of the evidence. We don't have anything until we file the complaint. So not until that happens can we properly understand the significant issues involved and not until we file the complaint and take advantage of the discovery rules. So I think for those two reasons, that's why there's such a high standard in dismissing a civil rights case at the pleading level. And if we looked at this case, if we look at whether or not we pled it, what it comes down to really is whether or not we pled sufficiently that J.S. was an unreliable witness. Because if we cut to the chase. So it seems like an incredible amount of discovery had transpired before the district judge ruled on the motion to dismiss for failure to state a claim. I presume that was because it took all that time before the motion was filed by your opposing counsel. Not that it was filed and the judge sat on it. It just took all that time for it to be filed. That's correct, Judge. It was surprising in that we went two years and conducted all the discovery and we anticipated a summary judgment motion, but not a motion to dismiss. And that was counsel's choice to file it that way, and we responded, and the court decided to dismiss it pursuant to Rule 12b-6. And it wasn't a case I believe the court could have, the counsel could have used extraneous material and then the court could have treated it as a summary judgment motion, but that didn't happen here. But if we look at whether or not we sufficiently pled whether or not J.S. was not a reliable witness, there's little doubt that we did. The defendants are not, at this point in the litigation, they're not contesting, they're not claiming that there's any merit to the child's allegations. This is simply a matter of qualified immunity and retaliation and that kind of thing at this point in time. In fact, I imagine that they concede that the police officer should not have done what the police officer did here. Is that right or not? I wish it was right, but I don't think they're going to concede that. We believe that the police officer knew, or certainly should have known, that the tale that J.S. was telling was completely incredible. I mean, to believe, and if we go back, and what we pled in our complaint is that J.S. was a mentally disturbed young man. We knew that. I believe we pled that he was institutionalized for two weeks. It was actually eight days, but we didn't know that. And then we also pled that there was a negative medical exam after he claimed he was sodomized for over a year. And we also claimed, and importantly, the proximity of the office. All of this allegedly occurred in a school setting, an administrative hub of the school, where the faculty would congregate. Their coffee was there, the mail room, with the door open. It almost seems as though the child's mother might have borne some culpabilities for all this, but you didn't sue the mother, did you? No, Your Honor. And I believe that Detective Rigney was at fault here. She was certainly put on notice that there was an issue here. And what she didn't do is really beyond belief. If you look at this case, Judge, she knew that there was an alleged sodomy of a seven-year-old child in an office setting with the door open and a naked counselor. She interviewed no one at the school. No one. There was a secretary. For the children, right? All of whom supported. But they went and interviewed all of the children, as I understood it, that he had counseled, correct? Correct, Judge. And found no evidence? Found no evidence. Found no evidence. But she did not interview any other teachers or the secretary or the principal? No. If she would have interviewed the secretary, and we're talking about Perry Fisher, who was a secretary and was outside the desk, there was only one time, date, place, specific allegation that J.S. made. And that occurred on what set this whole ball in motion after his suicide attempt. And Mr. Wesley was in his office with two children and was told by Perry Fisher to come out and help. He did that. Obviously, J.S. was upset. And Mr. Wesley went into action. He did what he was supposed to do. He made phone calls to North Quay. He called the parents. He even arranged for a taxi to take J.S. to the school. Perry Fisher witnessed all of that. And I would encourage the court to look. I believe it's document 57. It's cited throughout our brief. But she claims Mr. Wesley was never alone with J.S., never. And if the police would have, if Detective Rigney would have just interviewed Perry Fisher early on in this case, we wouldn't be here today. And Mr. Wesley, in all likelihood, would still be pursuing his career. Well, you don't know that for sure. She left some other things out. Maybe she would have interviewed that person and left that out. Thank you, Judge. Yeah, we don't know that. And if we could move on a little bit to the retaliatory arrest claim. I didn't file that initially because I didn't know a lot of those things. I didn't know that Rigney and Allison Campbell, the social worker, were friends. They went to girls' nights out. That Campbell, when she got the case, requested that Rigney do the case with her. She didn't call the police department and say assign someone. So they did it together. And then we also didn't know, I couldn't figure out the timing of this. Because if you've got an allegation from Detective Rigney that occurred, I believe, on February 6th, that there's a child rapist that's so brazen he does it with an open door in a school setting, why wouldn't you arrest him then? If she believed in her mind that she had probable cause to arrest, she'd never get any more than that. Why wouldn't she arrest him then? Why would she wait some 80 days with receiving no more inculpatory evidence, only exculpatory evidence? Why would she wait the 80 days? And the only reason that I can come up with is that she knew she didn't have probable cause. And what triggered the arrest? The only thing that actually happened was that Allison Campbell, through the social worker, substantiated her abuse, and Mr. Wesley appealed that through his then-attorney. Those documents were all found in Rigney's case file when she handed that to me some years later. Now, she wasn't copied on any of those documents, and she wasn't part of that substantiated abuse finding. She shouldn't have had those in her file if she wasn't privy to it and she didn't consider that issue as to whether or not she filed the complaint. Also, Judge, if we look at the tape, if Your Honors have had an opportunity to review that, the claims that J.S. made in that tape completely show why it was such an unreliable. I mean, if we're going to say that that was a reliable witness, how far are we going to go? In all sides, Your Honor, I see that I'm a little bit out of time. If I could finish my thought. Well, you're not quite out of time. Well, now you are, but why don't you finish your thought and we can conclude there. Judge Daughtry, I understand that you were on the panel of ailers, and I think that what the— Sometimes we don't want to be reminded of that, but you keep going. Thank you, Judge. But I think what's happening here is the defendant is attempting to take ailers to an illogical extreme because, you see, it's cited that all it takes is an eyewitness identification is good enough. And that's what the district court relied upon. But that witness has to be reliable. And in this case, there was a multitude of reasons why J.S. was not reliable. And we'd ask the court to utilize the other language in ailers, which I cited, which says that the police cannot turn a blind eye to exculpatory evidence, to pick and choose what they want to do to pin a crime on someone, et cetera, et cetera. Thank you, Judge. Thank you. We'll hear from Applee. Thank you, Your Honor. May it please the court. Bryce Rhodes for Officer Joanne Rigney. I will concede this was not a perfect investigation. There are perhaps more witnesses that Detective Rigney could have interviewed. There are other steps that could have been taken. But the fact is, at the time of the arrest, Detective Rigney had probable cause. We had a statement, first a statement made at the community health center, that Mr. Wesley had touched J.S. Then we have this interview at the Children's Advocacy Center where he goes into some detail, gives corroborating evidence of exactly where it occurred, what he could see at the time. He was able to put it into a time frame with his life. He mentioned that he had gone on through three different places that he had lived, first when he lived in Greenup Street, then when he lived in a homeless shelter. But that was a different story from the first complaint and a different story from the second explanation, wasn't it? Your Honor, you're right. It wasn't exactly consistent. First he said that it was over his clothes, and then he said that he took his pants down. And perhaps that's why he was only charged with sexual abuse in the first degree and not sodomy, because there was some inconsistency. But the fact was he was a young child. My concern is if you've got an 84-day time frame and you've got the three conflicting reports, and I believe the last report is pretty far back from the 84th day, and then she does not charge him with the activity alleged in the last interview. I mean, isn't that an indication that she found him unreliable in that last interview? And in light of that, how could she not have gone on and investigated to understand the reliability that she already is conceding she couldn't charge him with? Your Honor, and I don't know, because there is nothing on the record as far as why she waited that time, but I believe, I still believe the facts are, you know, you have, I believe the probable cause, what she had, the facts that might have undermined that. Perhaps if she had talked to Ms. Fisher, she might have changed her mind, but the facts are what were known to her as an officer at that time. I mean, I believe the victim's statement, you know, is in some detail, and I believe that that established probable cause. Was it why she waited? I don't know exactly. I don't know why perhaps she didn't speak to some of the teachers or things like that, but I mean, I do believe that nothing she knew at that time undermined her belief that there was probable cause. But do we want someone to be encouraged not to look? Do we want a rule that makes an investigator bury their head in the sand rather than trying to ascertain the real truth of the situation? And perhaps not. So you had three months when Mr. Wesley was still at the school every day counseling children, and here is this allegation that he has molested at least three of the children at that school, and nothing is being done in any kind of efficient fashion at all. That's correct. And perhaps, you know, it was just a matter of waiting to see if anything else emerged or just wanting to be sure before anything proceeded. And so she undertakes some other investigation, all of which tends to indicate that in fact there is no probable cause to arrest. I mean, I'm talking about the talking to the other children, finding out that nobody else had been molested. I'm talking about the medical report that showed that there wasn't any damage to this child's genitals. I'm talking about the absolutely improbable story he told about the fact that he was sodomized by this six-foot-tall man standing up. I mean, all of that, that should have somehow weighed on the decision to arrest him. I believe some of that did weigh. The fact, if you look at Detective Reganey's deposition, and also the prosecutor, Ms. Durstock, I'm talking about it's not unusual to have an unremarkable medical exam. That happens in quite a few. Oh, well, sure, but this child was saying he had been sodomized over and over and over again for a year. A seven-year-old child, and there'd be a negative medical report? I mean, that just, it really strains credulity, frankly. It certainly doesn't contribute to probable cause, but I believe it's common enough that it doesn't negate it. And also, the story you talked about, Ms. Durstock said, some of the things he said about when the abuse was occurring, that it might seem unusual to you, but to her it seemed it wasn't unusual, some of the things he was saying. This was consistent with her experience with children who had been abused. And the psychological issues, and Detective Reganey's opinion, and Ms. Durstock's opinion, that was common. In fact, that made abuse more likely than not. It contributed to, it wasn't a factor making him less credible. I believe the facts that were known to her were sufficient. Well, the other problem is to claim that there's corroboration because he knows what color table is in the room and that there's a window there, when in fact he has been counseled by Mr. Wesley over a period of time. Isn't that true? That's correct. That doesn't corroborate that something criminal happened here. It only corroborates the fact that he'd been in the room before. That doesn't make him a reliable witness as to what he is reporting happened with Mr. Wesley. It doesn't count. That's correct. You're right. He had been in the room before. I believe it contributes to it in the fact that the way he laid it out. Well, as he said, there was a chair in the room. There was a desk in the room. I mean, that doesn't tell you anything about whether he's reporting reliably that he was molested by this man. That's the problem with it. It doesn't corroborate. It only corroborates the fact that he's been in the room and not that anything untoward happened to him while he was there. That's right. It doesn't corroborate, but it doesn't detract from it either. I believe that we have here a lot of things that don't detract. We have the victim's statement. No examination of what would detract. All of us here get what's going on in these cases. You've got to protect the ability of a child to report abuse, just like you need to protect the ability of a woman to report abuse. Those are really significant issues. But our case law balances those against the destruction of someone else's life, and that's what Ehlers does. It seems to me it says this is going to be probable cause unless, and it's an important unless, unless you have real reason to believe that someone is unreliable. And isn't that your problem here? Is it she had reason to believe this child was unreliable? I don't believe at the time she did, Your Honor. Some things came out later, but again, the— Within the 84 days? I mean, the medical, again, the medical— The medical, the 30 children. The changing story starts out, he just touched my genitals over my clothes, and then it ends up with multiple sodomies by a man who's naked in his office at school over a year's time. All of that came out in the 84 days, didn't it? And all of it came out relatively close together, and it wasn't perfectly consistent, but it was a 7-year-old child. You're putting a nice gloss on it to say it wasn't perfectly consistent. Some of us would look at that, frankly, and say it was perfectly inconsistent. But go ahead. Isn't there one other problem with the case that the judge below took that vaquillion, I think is the name of the case, and used that as the standard? But that's a summary judgment case. It is, Your Honor. Do you concede that that was incorrect to use at the motion to dismiss stage where the real standard is plausibility, isn't it? Yes, Your Honor. And the way I would address that is the fact that I believe the judge could have converted that to a motion for summary judgment. But didn't. He did not. But didn't, and so he can't apply the standard that applies to summary judgment. That's correct, Your Honor. And with respect to the retaliatory arrest and the unlawful arrest, either probable cause existed or not. So I believe this court can look at that and use that vaquillion standard and convert it to a motion for summary judgment. If it were not to, if this were to be remanded, we would simply file a motion for summary judgment using that same evidence being used for the unlawful arrest to establish whether there's probable cause. So it essentially comes down to whether Detective Rigney had probable cause or not. Even if that standard was used improperly on a 12b-6, I believe that it could have been converted to a motion for summary judgment by the trial court. I would mention briefly with respect to the retaliatory arrest that in the vast majority, in fact, in every case I could find, the plaintiff was arrested for conduct directly related to the arrest. They made an insulting comment or were arrested for disorderly conduct. There was a causal connection there with the retaliatory arrest. Well, your opposing counsel says that there is conduct. The conduct is that he filed an appeal of being placed on, I couldn't tell whether it was an internal or an external sex offender registry. I believe it's an external that is used by the cabinet, yes, Your Honor. All right. So he said, no, I'm not going to leave my name on that. That's right. But in the typical retaliatory arrest case, the conduct is used as a, the conduct itself, the conduct that the plaintiff engages in, it's what they are arrested for. Mr. Wesley was not arrested for appealing. He was arrested for sexual abuse. He objected to that and he appealed the designation. He did. It seems to me that fits. In these other cases, for example, Kennedy v. Villa Hills, the person called a police officer a fat slob and then he was immediately arrested for that conduct. It's usually for exercising a free speech right, for cursing at a township meeting, someone was arrested for disorderly conduct. There's usually a direct connection in a retaliatory arrest case, which is just not present here. He was arrested for a crime that was completely independent of what the alleged retaliation was. The appeal was not, he was not arrested for conduct in his appeal, and I believe that's what distinguishes this from the other retaliatory arrest cases. I would stress again that, as you said, Your Honor, Ehlers does have an important condition on it. But J.S. was reliable. There was nothing to undermine the probable cause. He gave time and place details. He gave the first interview on the hills the same afternoon that he had fallen so completely apart that he was trying to commit suicide, right? Yes, Your Honor. Yes. Plus he kept changing his story. I believe it was consistent. Because he didn't share all the details immediately, I don't believe he changed his story. I believe it was all consistent with a pattern of abuse. He mentioned one incident in the taxi ride over, he mentioned one incident, and then later he elaborated at the Children's Advocacy Center and he talked about other things that had happened. He talked about how his counselor had done something bad, and he explained how the door was. He explained in detail what had happened on different occasions. When the mother got out of the car to take him into North Key or whatever it is, she didn't say, you attacked my son, you touched my son, did she? What she said was, I know what you told him. That's right. And what he had told him was, you go tell these people everything. That's correct. So was the mother objecting to what her son was going to say about what was going on at home? It doesn't sound like she was objecting to what had just happened at the school. Your Honor, she was very clearly upset, and then the next day she told another Covington police officer in detail what he had said in the cab ride, that he had touched him, his genitals. But you almost have an excited utterance here. She steps out and she says, I know what you told him. Not what you did to him, but what you told him. Impossibly, but we just have to look at the other statements and the fact that the prosecutor never doubted probable cause. And this case was dismissed solely because there were concerns about cooperation from J.S. and his mother. The prosecutor was confident that probable cause existed. And based on the facts known to Detective Rigney, there was probable cause to make the arrest of Mr. Wesley. Of course this was not a perfect investigation, but under the law, under Ehlers, Detective Rigney had enough for an arrest. She had a victim statement and probable cause existed. Counsel, why did you wait two years to file this motion to dismiss a failure to state a claim? Essentially what happened was, after the complete was amended, a decision was made to file this 12B6. And of course if that hadn't been successful, then a motion for summary judgment would have followed. But essentially it gave an opportunity when counsel amended his claim and added this retaliatory arrest. And perhaps summary judgment would have been more appropriate, but that would obviously be the next step. Well, when was the complaint amended? Was it two years after the lawsuit amended? It had been some time, and I don't have the exact date in front of me. It was after discovery had occurred. Essentially discovery concluded, yes, Your Honor. And that was another difficulty is that this was added after discovery. The complaint was amended after discovery had concluded, which was a bit of a difficulty for it. Has it made it difficult for us to have any discovery related to this retaliatory arrest claim? All right. Thank you. Thank you, Your Honor. Your Honor, as to Stephanie Kastner, who was the prosecutor below, and whether or not she believed that J.S.'s statement was reliable, Stephanie Kastner is a prosecutor who takes her job very seriously. And that's who we want handling sex crimes against children, certainly. She didn't watch the CAC video before she initialed the affidavit from Rigney. She relied on what Rigney told her. After she watched the CAC interview, she said that she interviewed J.S. for two minutes and decided not to take the case. Did she believe that J.S. was reliable? That's the only thing she looked at. She didn't know a lot of the things. Rigney didn't reveal a lot of those things to her. Also, judges, counsel says what the problem that we're going to have in this case. If this court returns this case back to district court, they're going to file a motion for summary judgment in front of the same judge that said that there wasn't probable cause. We had asked this court to make a finding that there was, in fact, no probable cause in regard to the retaliation claim. And that's important because that becomes a law of the case in the remand. And I believe that would stop us from coming back here again and allow Mr. Wesley to get his day in trial, which he deserves. If there's nothing else, I thank you. Has he been unemployed since the date of this? He's working at a hospice in Denver. Thank you. Thank you very much. The case is submitted.